D. Maimon Kirschenbaum
Michael DiGiulio
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 981-9587 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------x

| | |
|---|---|
| **YUNIASIH THE,** | **CASE NO. 1:25-CV-6755** |
| **Plaintiff,** | |
| v. | **COMPLAINT** |
| **HOGSALT,** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

-----------------------------------------------------x

Plaintiff alleges as follows:

## INTRODUCTION

1.  Plaintiff worked for Defendant as a server at their iconic "Monkey Bar" restaurant in mid-town Manhattan until Defendant cruelly fired Plaintiff because she is Indonesian and after they learned she had ovarian cancer and needed to take unpaid leave to recover from live-saving surgery. That is, Defendant mistreated Plaintiff for years – giving her the worst schedule, not allowing her to fill in for other servers, and writing her up – because she was Indonesian and, then after she complained, they retaliated against her. When Plaintiff notified Defendant that she had been diagnosed with ovarian cancer and needed to take unpaid leave, Defendant failed to engage her in the interactive process and failed to give her a reasonable accommodation – instead,

Defendant immediately fired Plaintiff the day before she had surgery to have her uterus removed. Defendant's actions are disgusting, unethical, and shameful. They are also illegal.

## JURISDICTION AND VENUE

2. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the Section 1981, 42 U.S.C. § 1981, *et seq.* ("Section 1981"). This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3. This Court also has original diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiff and the Defendant are citizens of different states – i.e., New York and Illinois, respectively – and Plaintiff claims damages of more than $75,000.

4. Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## THE PARTIES

5. Defendant Hogsalt ("Defendant" or "Hogsalt") is an Illinois based company that owns and operates Monkey Bar (the "Restaurant" or "Monkey Bar") located at 60 E 54th Street, New York, New York 10022.

6. Plaintiff Yuniasih The ("Plaintiff") was employed by Defendant as a server at Monkey Bar from January 2023 through July 2025. Plaintiff is Indonesian and was recently diagnosed with ovarian cancer.

2

**FACTS**

7. Defendant committed the following alleged acts knowingly, intentionally and willfully

8. Defendant owns and operates Monkey Bar – a restaurant and bar located in New York City.

9. Plaintiff was born in Indonesia and is of Indonesian ethnicity and ancestry.

10. Plaintiff was employed by Defendant as a server from January 2023 through July 2025, when Defendant's unlawfully terminated Plaintiff's employment.

11. In January 2023, Defendant hired Plaintiff to work as a server at Monkey Bar.

12. Defendant hired Plaintiff to work as a server full time.

13. The service director at Monkey Bar at this time was Kimmy Wade. Ms. Wade hired Plaintiff.

14. From January 2023-March 2023, Plaintiff worked full time. She normally worked two doubles and two-three dinners per week.

15. Plaintiff was an excellent server – hardworking, devoted, and professional.

16. Immediately, Ms. Wade recognized her work ethic and excellent performance and rewarded her by scheduling her full-time. Plaintiff's normal schedule was 4-5 days a week, with two double shifts per week.

17. In March 2023, Sam Lucas was promoted to general manager at Monkey Bar and took over the scheduling and management of the staff from Ms. Wade.

18. Mr. Lucas is white, male, and British.

19. Mr. Lucas had no input in and did not make the decision to hire Plaintiff.

3

20. Directly after taking over, Mr. Lucas cut Plaintiff's hours dramatically. Plaintiff went from working 4-5 days a week, with two double shifts to working 2 brunch shifts per week. Brunch shifts are notoriously the least desirable shifts at the Restaurant.

21. Mr. Lucas also cut the regular hours of two other non-white servers.

22. Mr. Lucas increased the working hours for many of the white servers, including many white servers who began working at Monkey Bar after Plaintiff began six months earlier.

23. Plaintiff immediately complained to Mr. Lucas about the scheduling change and asked him why her work schedule changed.

24. Mr. Lucas could not provide a cogent rationale and simply stated that he didn't have the shifts for her anymore. However, Mr. Lucas did have enough shifts to provide other white servers, who began working at Monkey Bar after Plaintiff, with 3-4 days of work per week.

25. To be clear, immediately after taking over as manager at Monkey Bar, Mr. Lucas cut the work schedules of Plaintiff and other non-white employees and gave more shifts to other white servers.

26. Mr. Lucas's discriminatory intent was clear from the way he treated Plaintiff. He often mocked Plaintiff's accent, pretending not to understand her and speaking comically slow as if Plaintiff could not understand him if he didn't treat her like an infant.

27. Mr. Lucas would also yell at Plaintiff and discipline her for things that he allowed other white servers to do or that he in fact instructed Plaintiff to do. For instance, Mr. Lucas would instruct Plaintiff to make certain guests who were lingering too long at their table to finish up and pay their check, but when she did this and the guests complained, Mr. Lucas blamed Plaintiff and reprimanded her for following his instructions.

28. Mr. Lucas also prevented Plaintiff from picking up shifts that were offered to her and that other white servers were allowed to pick up.

29. For example, a server asked Plaintiff to cover a shift for them, and the server informed Mr. Lucas that Plaintiff would cover this shift. This was the normal way that servers handled shift coverage and there was no reason for Mr. Lucas to object to Plaintiff covering the shift.

30. Instead, Mr. Lucas refused to allowed Plaintiff to cover the shift, insisting that a bartender (who is a not a server) cover the shift because they were "on call" that weekend. However, this bartender did not want to cover the shift and preferred Plaintiff to do it. Mr. Lucas purposefully prevented Plaintiff from picking up the shift that she had agreed to cover because of her race.

31. After Mr. Lucas took over, Plaintiff's shifts would sometimes disappear without warning. Often Plaintiff would be scheduled for a Monday shift, but a day or two before the shift, it would disappear on the work schedule app, and Plaintiff would lose the shift and be unable to work. Defendant kept blaming this issue on the "app", but the issue never fully resolved, and Plaintiff kept losing shifts in this manner. Defendant did not randomly cut its white server's shifts this way.

32. By way of another example, Defendant did not schedule Plaintiff for a "buy out" shift on a Sunday, which was given to white servers who never intended to work these shifts (and who never work on Sundays). When these white servers did not work this shift (and they had no intention of working these shifts) Defendant paid them $800. That is, Defendant provided a clear "buy out" benefit to white servers that it did not provide to Plaintiff.

33. Plaintiff suffered through Defendant's mistreatment in hopes that it would improve, but it did not.

34. In October 2024, Plaintiff finally decided to complain to Defendant's HR department about her mistreatment.

35. Specifically, Plaintiff complained she was treated with respect and dignity until Mr. Lucas took over as the manager at Monkey Bar. She complained that Mr. Lucas treated her worse than other white employees, that he reduced her schedule when he took over and gave more shifts to newer white servers, and that she believed Mr. Lucas thought she was dumb because of her accent. Plaintiff further complained about Mr. Lucas's micro-managing of her ability to cover shifts for other servers and his attempts to prevent her from picking up shifts.

36. In response to Plaintiff's complaints, Defendant set up a meeting with HR representative : Ms. Anali Polanco, Mr. Lucas, and Mr. Esteban Dudley. At this meeting Defendant brushed off Plaintiff's complaints and simply assured Plaintiff that Mr. Lucas was not discriminating against her.

37. That is, Defendant's response to Plaintiff's complaints was not to investigate her claims or to interview Plaintiff or ask follow up questions. Instead, Defendant forced Plaintiff to confront her manager in a staged meeting, during which Plaintiff felt extremely uncomfortable and pressured to agree with Defendant's position – which was that Mr. Lucas was a "good guy" and any issues was just a "misunderstanding."

38. However, after this in-person meeting, Defendant began retaliating against Plaintiff.

39. After her complaints, Plaintiff was written up by Defendant for things that she was instructed to do and things that were not violations of company policy.

40. For example, Defendant wrote up Plaintiff after a customer complained because the restaurant could not accommodate the customer's extremely unreasonable and excentric food requests. Plaintiff explained the various ways in which the Restaurant could accommodate the guest, but the guest was not satisfied. That is Plaintiff did not have the power, and the Restaurant did not have the capacity, to satisfy this guest, and yet after the guest complained, Defendant wrote up Plaintiff for failing to provide adequate service. This is facially ridiculous.

41. By way of another example, Defendant claimed that a guest complained about Plaintiff because their order – a lobster scramble – tasted like soup. Defendant claimed that the guest could not get Plaintiff's attention, but this untrue. Plaintiff notoriously checks in with her tables at least 3-4 times per meal, and, thus, she did check in with this table and never received the complaint about the lobster scramble. Nevertheless, Defendant wrote up Plaintiff for not providing adequate service.

42. Defendant did not write up other servers for specious and unfounded reasons. And Defendant did not write up servers who did not complain about discrimination, for specious and unfounded reasons. For almost two years prior to complaining in October 2024, Plaintiff had an exemplary disciplinary record at Monkey Bar, but after she complained, she was written up multiple times for baseless reasons. This is classic retaliation.

43. After she complained, in January 2025, Defendant tried to write Plaintiff up for not providing a doctor's note when having another server cover her shift. This was outrageous. No other servers require a doctor's note in order to have another server cover their shift if they cannot make it. In this instance, Plaintiff had a medical issue that prevented her from working a shift, so she asked another to cover it, who happily agreed. When Plaintiff and the other server notified Defendant of this shift change – which is the normal and routine way that shift covers are

7

communicated – Defendant refused to accept it and requested that Plaintiff provide a doctor's note and threatened to write up Plaintiff if she could not provide one. Not only is this request illegal, but it is also discriminatory. Defendant simply does not require this type of medical documentation from other white servers or from other servers that have not complained about discriminatory treatment. When the other server (who is white) stood up to Defendant about this outrageous request, Defendant backed down and allowed the server to cover Plaintiff's shift without further issue. Without the support of her white colleague, Plaintiff would have been written up for another nonsense reason.

44. On June 24, 2025, while riding the subway Plaintiff began experiencing sharp and piercing pain in her abdomen. Shortly after she collapsed and was rushed to the hospital.

45. Within days she was diagnosed with ovarian cancer and was scheduled for an emergency surgery to remove her uterus, ovaries, and all of the large tumors growing throughout her body.

46. Plaintiff's emergency surgery was scheduled for July 3, 2025.

47. On June 29, 2025, Plaintiff sent a doctor's note to Defendant's HR department and notified them that she had been diagnosed with ovarian cancer, was scheduled for surgery on July 3, and requested to take 8 weeks of unpaid leave because she needed to recover from the surgery.

48. On June 30, Defendant's HR representative responded to schedule a call with Plaintiff to "talk through your situation."

49. On July 2, the day before Plaintiff's emergency hysterectomy, Defendant's HR representative called Plaintiff on the phone to tell her that Defendant could not give her 4 weeks of unpaid medical leave, and if she took that leave, she wouldn't have a job. In substance, Defendant told Plaintiff she was fired.

50. A few days later, Defendant's HR representative emailed Plaintiff an employment termination notice.

51. Defendant fired Plaintiff because Defendant did not provide unpaid medical leave to their employees for leave over 4 weeks.

52. However, this is simply not true. Defendant has allowed other employees at Monkey Bar to take 3 months of unpaid leave without terminating their employment. Notably, these employees are white and were not suffering from ovarian cancer. For example, a white server named SH[1] was allowed to take 3 months of unpaid medical leave, and she retained her job.

53. Defendant's decision to apply this outrageous "policy" to Plaintiff and not to other white employees is racist and illegal.

54. Moreover, ovarian cancer is a disability, and Plaintiff's request for 8 weeks of leave to recover from emergency surgery, supported explicitly by a doctor's note, is plainly a request for a reasonable accommodation.

55. Defendant's response, to immediately terminate Plaintiff's employment is illegal.

56. Defendant failed to engage Plaintiff in the interactive process or constructive dialogue required when evaluating an employees' reasonable accommodation. Thus, Defendant's termination of Plaintiff's employment without first engaging the in the constructive dialogue is a clear violation of law.

57. Furthermore, as a substantive matter, 8 weeks of unpaid leave to recover from an emergency surgery is a patently reasonable accommodation. This is clear from the fact that Plaintiff's physician had recommended this accommodation and Defendant had provided a more generous version of this accommodation to other employees previously (although, white

---

[1] Plaintiff uses SH as a stand-in to protect the identity of this individual.

employees). That is, it would clearly not have been a substantial burden on Defendant's business to allow Plaintiff to come back to work after 8 weeks of unpaid leave.

58. Instead, Defendant's chose to fire Plaintiff moments before she underwent emergency, life altering surgery. Defendant's actions are disgusting, unethical, and illegal.

59. Plaintiff brings this action to vindicate her civil rights and recover her damages for Defendant's illegal conduct.

## FIRST CLAIM FOR RELIEF
### The Civil Rights Acts - 42 U.S.C. § 1981, *et seq.* ("1981")
### Race/Ethnicity/Ancestry - Discrimination

60. Plaintiff realleges and incorporates by reference all previous paragraphs.

61. In violation of the 1981, Defendant intentionally discriminated against and/or aided and abetted discrimination against Plaintiff on the basis of her Indonesian race/ethnicity/ancestry.

62. Defendant's discrimination was sufficiently severe or pervasive as to affect the terms of Plaintiff's employment.

63. Among other things, Defendant reduced Plaintiff's work schedule and terminated Plaintiff's employment because of her race/ethnicity/ancestry.

64. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

65. As a direct and proximate consequence of Defendant's discrimination against Plaintiff, she has suffered, and continues to suffer, substantial monetary and non-monetary damages, including but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation, and anguish.

66. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for lost wages, back pay, and emotional distress;

punitive damages; front pay; post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### The Civil Rights Acts - 42 U.S.C. § 1981, *et seq.* ("1981")
### Race/Ethnicity/Ancestry – Retaliation

67. Plaintiff realleges and incorporates by reference all previous paragraphs.

68. In violation of the 1981, Defendant intentionally retaliated against and/or aided and abetted retaliation against Plaintiff on the basis of her complaints about her mistreatment because of her Indonesian race/ethnicity/ancestry.

69. Defendant's retaliation was sufficiently severe or pervasive as to affect the terms of Plaintiff's employment..

70. Among other things, Defendant reduced Plaintiff's work schedule and terminated Plaintiff's employment in retaliation for complaining about her mistreatment because of her race/ethnicity/ancestry.

71. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

72. As a direct and proximate consequence of Defendant's discrimination against Plaintiff, she has suffered, and continues to suffer, substantial monetary and non-monetary damages, including but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation, and anguish.

73. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for lost wages, back pay, and emotional distress; punitive damages; front pay; post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper.

**THIRD CLAIM FOR RELIEF**
**New York State Human Rights Law ("NYSHRL")**
**N.Y. Exec. L. §§ 290 et seq. – Race/Ethnicity/National Origin/Disability - Discrimination**

74. Plaintiff realleges and incorporates by reference all previous paragraphs.

75. In violation of the NYSHRL, Defendant intentionally discriminated against Plaintiff and/or aided and abetted discrimination against Plaintiff on the basis of her Indonesian race, ethnicity, and national origin, and/or because she was diagnosed with ovarian cancer.

76. Among other things, Defendant reduced Plaintiff's work schedule and terminated Plaintiff's employment because she was Indonesian and/or because she was diagnosed with ovarian cancer.

77. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

78. As a direct and proximate consequence of Defendant's discrimination against Plaintiff, she has suffered, and continues to suffer, substantial monetary and non-monetary damages, including but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation, and anguish.

79. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for lost wages, back pay, and emotional distress; punitive damages; front pay; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**
**New York State Human Rights Law ("NYSHRL")**
**N.Y. Exec. L. §§ 290 et seq. – Race/Ethnicity/National Origin/Disability – Retaliation**

80. Plaintiff realleges and incorporates by reference all previous paragraphs.

81. In violation of the NYSHRL, Defendant intentionally retaliated against Plaintiff and/or aided and abetted retaliation against Plaintiff because she complained about her mistreatment because of her Indonesian race, ethnicity, and national origin, and/or because she requested an accommodation for her ovarian cancer diagnosis.

82. Among other things, Defendant reduced Plaintiff's work schedule and terminated Plaintiff's employment because she complained about being mistreated because she is Indonesian and/or because she requested an accommodation for her ovarian cancer diagnosis.

83. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

84. As a direct and proximate consequence of Defendant's discrimination against Plaintiff, she has suffered, and continues to suffer, substantial monetary and non-monetary damages, including but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation, and anguish.

85. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for lost wages, back pay, and emotional distress; punitive damages; front pay; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**
**New York City Human Rights Law ("NYCHRL")**
**N.Y.C. Admin. Code § 8-107, et seq. – Race/Ethnicity/National Origin/Disability - Discrimination**

86. Plaintiff realleges and incorporates by reference all previous paragraphs.

87. In violation of the NYCHRL, Defendant intentionally discriminated against and/or aided and abetted discrimination against Plaintiff on the basis of her Indonesian race, ethnicity, and national origin, and/or because she was diagnosed with ovarian cancer.

13

88. Among other things, Defendant reduced Plaintiff's work schedule and terminated Plaintiff's employment because she was Indonesian and/or because she was diagnosed with ovarian cancer.

89. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

90. As a direct and proximate consequence of Defendant's discrimination against Plaintiff, she has suffered, and continues to suffer, substantial monetary and non-monetary damages, including but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation, and anguish.

91. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for lost wages, back pay, and emotional distress; punitive damages; front pay; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
### New York City Human Rights Law ("NYCHRL")
### N.Y.C. Admin. Code § 8-107, et seq. – Race/Ethnicity/National Origin/Disability – Retaliation

92. Plaintiff realleges and incorporates by reference all previous paragraphs.

93. In violation of the NYCHRL, Defendant intentionally retaliated against Plaintiff and/or aided and abetted retaliation against Plaintiff because she complained about her mistreatment because of her Indonesian race, ethnicity, and national origin, and/or because she requested an accommodation for her ovarian cancer diagnosis.

94. Among other things, Defendant reduced Plaintiff's work schedule and terminated Plaintiff's employment because she complained about being mistreated because she is Indonesian and/or because she requested an accommodation for her ovarian cancer diagnosis.

95. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily protected civil rights.

96. As a direct and proximate consequence of Defendant's discrimination against Plaintiff, she has suffered, and continues to suffer, substantial monetary and non-monetary damages, including but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation, and anguish.

97. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for lost wages, back pay, and emotional distress; punitive damages; front pay; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
### New York City Human Rights Law ("NYCHRL")
### N.Y.C. Admin. Code § 8-107, et seq. –Disability – Failure to Accommodate

98. Plaintiff realleges and incorporates by reference all previous paragraphs.

99. Plaintiff was diagnosed with ovarian cancer, which is a disability under the NYCHRL.

100. Plaintiff informed Defendant that she had ovarian cancer and requested 8 weeks off from work (i.e., 8 weeks of unpaid leave). This request was a request for a reasonable accommodation.

101. Defendant immediately fired Plaintiff for requesting this reasonable accommodation.

102. Defendant did not engage in the constructive interactive process to determine whether Plaintiff's request was a reasonable accommodation and Defendant failed to provide or offer Plaintiff with a reasonable accommodation.

103. As a direct and proximate consequence of Defendant's failure to engage in the interactive process and provide Plaintiff with a reasonable accommodation, Plaintiff has suffered, and continues to suffer, substantial monetary and non-monetary damages, including but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation, and anguish.

104. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for lost wages, back pay, and emotional distress; punitive damages; front pay; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as the Court deems just and proper

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A. An award of damages, according to proof, including compensatory and liquidated damages, to be paid by Defendant;

B. An award of punitive damages, to be paid by Defendant;

C. Penalties available under applicable laws;

D. Costs of action incurred herein, including expert fees;

E. Attorneys' fees, including fees pursuant to 42 U.S.C. § 1981, and other applicable statutes;

F. Pre-judgment and post-judgment interest, as provided by law; and

G. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated: New York, New York  
       August 15, 2025

Respectfully submitted,

JOSEPH & KIRSCHENBAUM LLP

By: /s/ *D. Maimon Kirschenbaum*
D. Maimon Kirschenbaum
Michael DiGiulio
32 Broadway, Suite 601
New York, NY 10004
Tel: (212) 688-5640
Fax: (212) 981-9587

*Attorneys for Plaintiff*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.